Randy M. Andrus (10392)
**ANDRUS LAW FIRM, LLC**
299 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2241
Telephone: (801) 535-4645
Email: randy@andrusfirm.com

*Attorney for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **BAYLEE JENSEN;**<br>**JESSICA McCARTNEY;**<br><br>               Plaintiffs,<br><br>vs.<br><br>**XLEAR, INC.; WILLIAM (BILL) ROBBS;**<br>**DOES** 1 through 50, inclusive,<br><br>               Defendants. | **COMPLAINT FOR DAMAGES**<br><br>**(JURY TRIAL DEMANDED)**<br><br>Case No.2:19-cv-00413-EJF<br><br>Honorable Judge<br><br>Magistrate Judge Evelyn J. Furse |

      **COME NOW**, Plaintiffs, and without waiver of any rights or entitlements, including to amend, allege against Defendants jointly and severally, as follows:

### I.  PARTIES AND RELATED PARTIES

      **1.**     Plaintiff, **BAYLEE JENSEN** (hereinafter "**Plaintiff**" or "**JENSEN**") is, and at all times mentioned in this Complaint was, an individual, residing in the State of Utah.

      **2.**     Plaintiff, **JESSICA McCARTNEY** (hereinafter "**Plaintiff**" or "**McCARTNEY**") is, and at all times mentioned in this Complaint was, an individual, residing in the State of Utah.

3.      Plaintiffs are informed, and believe and on that basis allege that Defendant, **XLEAR, INC.** (hereafter "**Defendant**" or "**XLEAR**") is, and at all times mentioned in this Complaint was, a business entity, located and/or doing business from its registered place of business in Utah County, State of Utah.

4.      Defendant, **WILLIAM (BILL) ROBBS** (hereinafter "**Defendant**" or "**ROBBS**") is, and at all times mentioned in this Complaint was, an individual, residing in Utah County, State of Utah.

5.      Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as **DOES** 1 through 50, and therefore sue said Defendants by such fictitious names.  Plaintiffs are informed and believe, and on that basis, allege that each Defendant named herein is responsible in some manner for the acts, omissions, and occurrences herein alleged, and that Plaintiffs' damages, as hereinafter alleged, were proximately caused by such occurrences. Plaintiffs will amend this Complaint to allege the true names and capacities of such Defendants when they are ascertained and based on her rights to conduct discovery.

6.      Plaintiffs are informed and believe, and on that basis allege, that each Defendant may or may not have been the agent, servant, and/or employee of each Defendant and may or may not have acted in a concerted conspiracy, pursuant to a common plan, civil conspiracy, or other common and/or integrated enterprise, and that each Defendant may or may not have authorized, ratified, and/or negligently supervised, each act of each Defendant, and that each Defendant is and/or may or may not be the alter ego of each Defendant.  Plaintiffs are informed and believe and, on that basis, allege that Defendants were and are responsible for the acts causing Plaintiffs' damages.  All Defendants are collectively referred to as "Defendants".

## II.  JURISDICTION AND VENUE

7.     The Court has jurisdiction over this matter by virtue of federal question jurisdiction, including arising under the laws of the United States, including *Title VII of the Civil Rights Act of 1964*, as amended ("*Title VII*"), 42 U.S.C. §§ 2000e-2(a)*, et seq.* for employment discrimination, including as amended by *The Pregnancy Discrimination Act of 1978* ("*PDA*") (Pub.L. 95-555), Section 701 of *The Civil Rights Act of 1964*, subsection (k).  Jurisdiction is specifically conferred on this Court by the United States Constitution and under its Amendments, including of Equal Protection, and the laws of the United States including the above federal statutes.  Equitable and other relief are also sought, including under 42 U.S.C. 2000e(5)(g).  The Court also has supplemental and/or ancillary jurisdiction over related pendant claims which also exist.  Jurisdiction is also based on 28 U.S.C. §§ 1331, 1343, and 1367.

8.     Venue is proper by virtue of 28 U.S.C. § 1391 as the parties reside; have their principal place of business; are incorporated; are citizens with physical presence and the intent to remain indefinitely in Utah and in this District; and/or are subject to jurisdiction in this District as the the most significant contacts, events or omissions giving rise to the claims occurred here. The claims and circumstances herein share and arise out of a common nucleus of operative facts.

## III.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.     On or about May 18, 2018, Plaintiff Baylee Jensen filed Charges of Discrimination including with the United States Equal Employment Opportunity Commission ("EEOC"), case number 35C-2018-00411.

10.     On or about June 4, 2018, Plaintiff Jessica McCartney filed Charges of Discrimination including with the United States Equal Employment Opportunity Commission ("EEOC"), case number 35C-2018-00472.

11.     On or about March 21, 2019, the EEOC issued a Notice of Right to Sue to each Plaintiff, attached hereto as **EXHIBITS A** and **B** respectively. Plaintiffs have exhausted their administrative remedies.

12.     The Complaint in this action was timely filed within the 90-day period specified in the respective Notices of Right to Sue.

### IV.   FACTUAL BACKGROUND AND ALLEGATIONS

#### A.     *Defendants' Structure and Hierarchy*

13.     At all times relevant, including since approximately 2000 to present, Defendant XLEAR is believed to be a domestic for-profit company and enterprise, engaged in interstate commerce with its headquarters and principal place of business located at 723 South Auto Mall Drive, American Fork, Utah 84003.

14.     At all times relevant, XLEAR is primarily a manufacturer of sinus and nasal sprays and other xylitol-based sweetener products which it distributes in various locations in Utah and North America.

15.     At all times relevant, including since 2013, Defendant Robbs is and has been an individual; and an owner, officer, proxy, and/or agent of XLEAR.

#### B.     *Defendant XLEAR Had a Special Relationship With Plaintiffs*

16.     From November 27, 2017 to in or about April 2018, a special relationship existed between XLEAR and each Plaintiff, including an employer-employee relationship.

17.     From 2013 through April 2018, Robbs was in a position of authority, power, and trust over Plaintiffs and their employment, including as XLEAR's proxy, agent, and an owner.

18.     On or about November 27, 2017, and thereafter, each Plaintiff and XLEAR entered into express oral and implied contracts, promises and agreements.

19.     Among the contracts, promises, agreements, and representations made by XLEAR to each Plaintiff, and to induce each to rely, and upon which each did rely, leave other employment and opportunities, and enter into the agreements, were promises and representations that XLEAR would not discharge Plaintiffs without good, just, or legitimate cause.

20.     Each Plaintiff agreed to be employed by XLEAR and provide their substantial time, talent, skill, experience, knowledge, and industry.

21.     XLEAR agreed in exchange that it would pay compensation to each Plaintiff, including wages, vacation, bonuses, and other compensation.

22.     XLEAR also agreed that it would not act arbitrarily with either Plaintiff.

23.     XLEAR also agreed that it would act with mutual consent with each Plaintiff.

24.     XLEAR also agreed that it would act with mutual respect towards each Plaintiff.

*C. Defendants Assisted, Enabled and Were Complicit in the Conduct Toward Plaintiffs*

25.     Prior to November 2017, XLEAR and Robbs knew, but failed to warn or protect Ms. Jensen and Ms. McCartney, of and from Robbs's sexual harassment and behaviors towards female employees of XLEAR, and that Robbs's behaviors had resulted in other women being harassed, harmed, disrespected, and injured including in the workplace at XLEAR.

26.     Prior to November 2017, XLEAR created and with Robbs had special knowledge of, and approved XLEAR's no-tolerance anti-harassment, anti-retaliation, and harassment-free

environment policies expressly prohibiting any form of unlawful harassment by anyone, including any supervisory personnel, co-worker, vendor, client, or customer, that is sexual in nature or based on race, color, religion, gender, pregnancy, disability, and/or any other status or characteristic protected by law, and that violation of XLEAR'S policy will result in disciplinary action up to and including termination.  XLEAR'S harassment-free environment policy also prohibits retaliation against anyone who raises a complaint of discrimination or harassment in good faith or anyone who witnesses discrimination or harassment.  XLEAR and Robbs each had a specific mental state in which Robbs, individually and as an agent of XLEAR, knew or expected that injury would be caused by and the consequences of his actions towards women, including Plaintiffs.

27.     XLEAR'S additional policy, Maintaining a Harassment Free Environment at the workplace, states:

> "Although we have always believed in the principles underlying a harassment free environment, Xlear, Inc. believes that this subject is important enough to warrant a specific policy statement, which is written below.

> **A.     PURPOSE**

> In order to provide a productive and pleasant working environment, it is important that we at Xlear maintain an atmosphere characterized by mutual respect.  Accordingly, the kind of conduct characterized as harassment below is not tolerated. In addition, we need to protect company employees (to the extent possible) from reported harassment by non-employees.

> **B.     DEFINITIONS**

> 1.     In general, ethnic or racial slurs, jokes, and other verbal or physical conduct relating to a person's race, color, religion, age (40 and over), sex, gender, sexual orientation, gender identity, pregnancy, disability, national origin, ethnic background, genetic information (including of a family member), military service, and/or

citizenship, or any other classification protected by applicable local, state or federal law may constitute harassment (including sexual harassment) when they unreasonably interfere with a person's work performance or create an intimidating work environment.

2.    Sexual harassment has been defined by federal and state regulations as a form of sex discrimination. It can consist of unwelcome sexual advances; requests for sexual favors; the display of derogatory posters, cartoons, or drawings; or other physical or verbal conduct of a sexual nature by supervisors or others.

    (a)    Sexual harassment exists when:

        (1)    Supervisors or managers make submission to the type of conduct described above either an explicit or implicit term or condition of employment decision (including hiring, compensation, promotion or retention); or

        (2)    Supervisors or managers use submission to or rejection of such conduct as a basis for employment decisions.

    (b)    Sexual harassment may also exist when the type of conduct described above unreasonably interferes with another employee's work performance, or creates an intimidating, hostile or offensive work environment.

3.    Employee for the purpose of this policy statement is defined as anyone that is employed by Xlear including officers, managers and supervisors.

## C.    POLICY

Harassment, including sexual harassment, is contrary to the basic standards of conduct between individuals, and state law, the Federal Employment and Housing Commission (FEHC), and EEOC regulations prohibit it. It is a violation of company policy for any employee to engage in any of the acts or behavior defined above.  This includes doing any of the following, which may unreasonably affect or interfere with an employee's work performance to other employees, clients, suppliers, or other associates of Xlear or which could create an intimidating, hostile or offensive work environment.

1.      Threaten or insinuate either explicitly or implicitly that another employee's refusal to submit to sexual advances will adversely affect the employee's employment, evaluation, wages, advancement, assigned duties, or any other condition of employment or career development.

2.      Make unwelcome sexual flirtations, advances, or propositions.

3.      Engage in verbal abuse (including of a sexual nature).

4.      Display sexually suggestive or derogatory pictures, cartoons, posters, or drawings.

5.      Make slurs, jokes, and other verbal, graphic, or physical gestures relating to an individual's race, color, religion, age (40 and over), sex, gender, sexual orientation, gender identity, pregnancy, disability, national origin, ethnic background, genetic information (including of a family member), military service, and/or citizenship, or any other classification protected by applicable local, state or federal law.

The Company does not tolerate violations to this policy, whether such acts or behavior occur on company premises or while at such activities as trade shows, visiting clients/vendors, etc. The Company takes corrective action when an employee is determined to have violated this policy. Such actions may include a wide range of disciplinary measures up to and including discharge."

### D.      Plaintiff Baylee Jensen

**28.**      On November 27, 2017, Ms. Jensen, a female then-age 23, began her employment with XLEAR full-time in the position of E-Commerce Sales Manager.

**29.**      While employed at XLEAR, Ms. Jensen was to be paid an annual salary of $50,000, commissions, bonuses, and other compensation.

**30.**      Robbs, then-age 48, an owner, officer (Vice President), proxy, and/or agent of XLEAR, was Mr. Jensen's immediate supervisor and a member of senior management.

31.     At, or shortly after the time Ms. Jensen was hired, Robbs noticed and became very attracted to her.

32.     Unlike the male person whose position Ms. Jensen replaced, Robbs sought to treat Ms. Jensen, a female, differently by engaging in much travel with her including alone on extended business trips out of state to trade shows and visiting clients and/or vendors.

33.     During the business trips, Robbs engaged in unwelcomed sexual harassment and created a hostile work environment with many uncomfortable, inappropriate, and offensive sex-based comments towards Ms. Jensen and cornering and probing her about her personal life.

34.     In December 2017, Robbs took Ms. Jensen on what was to be a trip for a business account meeting in Long Beach, California.  This was their first work trip together.  Upon arriving at the hotel where Ms. Jensen was to stay, Robbs went to her room stating he had to make a "business call".  Once in Ms. Jensen's room, Robbs began to disrobe by taking off his shirt to "soak up the sun" on the balcony.  He proceeded to get "comfortable" on Ms. Jensen's hotel-room bed.  Robbs talked about prior business trips he had taken volunteering that he "did not sleep with girls, but they came around."

35.     During the Long Beach trip, Robbs engaged in unwelcomed and unpermitted touching of Ms. Jensen's person, including by giving her unsolicited hugs.

36.     In a subsequent business trip in December 2017, Robbs took Ms. Jensen to New York.  After arriving, Robbs asked Ms. Jensen to go hot tubbing with him.  Robbs's request was unwelcomed and unsolicited.  Ms. Jensen said "no".  When Ms. Jensen also stated she did not bring her swimming suit, Robbs suggested she come in her bra and underwear.  Also, during this

trip, Robbs made unsolicited, unwelcomed, and offensive sex-based personal comments, including about his wife's "boob job" and body, and other personal details about her and them.

      **37.**    After New York, Robbs, wanting to spend more time alone with Ms. Jensen, drove her to Philadelphia for a business account meeting, then they flew to Chicago.

      **38.**    In Chicago, Robbs continued making unsolicited, unwelcomed, harassing, and offensive sex-based personal comments directed to Ms. Jensen.  For example, Robbs tells Ms. Jensen to wear Lulu leggings to exercise and run in front of him "for motivation".

      **39.**    In subsequent occasions after returning to Utah, Robbs over months continued with his unwelcomed, unsolicited, and offensive sexual harassment towards Ms. Jensen and his continuing creation of a severe and pervasive offensive and hostile work environment, including:

      ■    Making comments about and/or directed to Ms. Jensen and her physical appearance and body; how he wanted to travel with her; stating that she was "hot", "sexy", a "Booth Babe" for trade shows.

      ■    Engaging in inappropriate physical touching, assault and battery, of Ms. Jensen person and body without her consent, such as brushing up against and touching of her body and buttocks.

      ■    Making unsolicited expressions and sexual innuendos, sexual flirtations, sexual advances and sexual propositions directed to Ms. Jensen including that she spend time with him outside of the office; commenting that he is a "bad bad boy"; and suggesting that he is "solid in a good way".

      ■    Making unwelcomed offers to buy Ms. Jensen things such as clothes, shoes, massages, and travel; wanting to spend more time with her; stating to her, "Hang

around me long enough and I'll take you anywhere you want."  "I'll take you anywhere in the world."

■      Multiple comments about Ms. Jensen's personal physical appearance, body, and probing inquiries about her personal and dating life.

■      Expressions of irritation and being upset directed at Ms. Jensen when she did not text him, and that she would not spend time with him outside of the office.

■      Insisting that he wants to take Ms. Jensen out to a five-course meal, including for her birthday demanding that she spend more time with him. Uncomfortable, Ms. Jensen refused Robbs's unwelcomed demands, sexual flirtations, sexual advances, and advances, saying "no", and telling Robbs he should enjoy the day (Valentine's Day) with his wife.

■      Engaging in inappropriate physical touching, assault and battery, of Ms. Jensen person and body without her consent, such as touching her body and buttocks using a Thera gun (a neuromuscular percussive therapy device that provides muscle activation, recovery, and pain relief) which Robbs brought into the workplace, and acted as if it was a sexual vibrator.

■      Making vulgar encounters with scary sexually-offensive comments directed to Ms. Jensen such as, "I'll just be your pimp" and of "blow jobs".

40.    In the latter half of February 2018, Robbs directed Ms. Jensen to go on another business trip with him to Spokane, Washington for account meetings.  During this trip, Robbs offered to buy Ms. Jensen gifts, including shoes, and sent texts her at her hotel saying he should have brought coconut oil to massage her body.  Robbs went on to make suggestions to Ms.

Jensen that they should share a hotel room together.  Later on this trip, Robbs insisted on driving Ms. Jensen from Spokane to Seattle, not that there was any business in Seattle, but only for Robbs to be with Ms. Jensen, show her the city of Seattle, and take her out to dinner, before their next business trade show in Vancouver.

41.     While in Seattle, Robbs saw a man looking at Ms. Jensen.  Robbs said to Ms. Jensen that he (Robbs) was going to "kill that guy".  Also, during this trip, Robbs repeatedly and purposely brushed up against Ms. Jensen physically touching her body, unwelcomed and unpermitted.

42.     The next day in Vancouver for a business meeting trade show, Robbs continued his constant barrage of sexual innuendo, advances, and comments directed at Ms. Jensen personally, stating such things as, "I'll just be your pimp."  "Hang around me long enough and I'll take you anywhere you want."  "I'll take you anywhere in the world."  At the trade show, Robbs commented to people who were behind Ms. Jensen: "You have a good show, don't you?" referring to Ms. Jensen's physical body and back-side appearance.  These comments were also upsetting to Ms. Jensen; further interfered with Ms. Jensen's work performance; and created a further severe and intimidating, hostile, and offensive work environment.  Robbs knew and could tell that his behaviors and comments towards Ms. Jensen were upsetting to her as he pulled her aside and asked her if she was good.  She wasn't.  They then drove from Vancouver to Seattle, and when Ms. Jensen wasn't talking much, Robbs demanded, "Why are you not talking?" "Don't you want to be with me?"

43.     When making comments directed to Ms. Jensen, including those above, Robbs would watch for Ms. Jensen's reaction and ask her questions about how she felt when he made

those comments knowingly and intentionally, with an intent to injure and cause harm and distress to Ms. Jensen and for the "shock value". XLEAR and Robbs intended and expected to cause Ms. Jensen injury and distress by Robbs's behaviors. Ms. Jensen knew Robbs did not like it when she was unresponsive, and Robbs would become angry and hostile at her.

44.     The work environment became increasingly hostile, offensive, and intimidating. When Ms. Jensen would not respond as Robbs wanted, Robbs would made demeaning demands and statements with further intent to injure and cause harm and distress to Ms. Jensen.

45.     On or about February 27, 2018, Robbs called Ms. Jensen about her not talking to him or texting him. Ms. Jensen complained to Robbs, and voiced her concerns; however, Robbs responded by berating her; making comments about her personal life; and giving her a detailed run down of guys she had gone out with and when she had been on dates.

46.     XLEAR and Robbs knew Ms. Jensen was a ball of nerves around him and he knew how uncomfortable he made her, and they acted intentionally despite such knowledge.

47.     In the first half of March 2018, Ms. Jensen went on another business trip to the Los Angeles, California area for an ExpoWest trade show. Robbs also went. When Ms. Jensen arrived, Robbs told Ms. Jensen that he tried getting a beach house for her and him but that it wouldn't look good since other employees were there.

48.     While other employees, including Plaintiff Ms. McCartney, were setting up the trade show booth, assembling shelving, seating, displays which involved a lot of bending, Robbs was wandering around and while Ms. McCartney (pregnant) was bent over putting a drawer together, Robbs made unsolicited and unpermitted touching of Ms. McCartney's physical body striking and slapping Ms. McCartney on her buttocks knowingly and intentionally with intent to

injure and cause harm and distress to Ms. McCartney.  Robbs then said, "I couldn't help it."   Ms.
McCartney complained to Robbs about his behaviors, and specifically told Robbs "that's not
okay."  In observing Robbs, one could tell that Robbs could see and knew that Ms. McCartney
was upset.  Despite Ms. McCartney's complaints, the harassment, hostile work environment, and
abuse did not stop but rather continued.

49.     In or about the first half of April 2018, Ms. Jensen went to Robbs's office and
complained to him about the concerns, including the sexual harassment and hostile work
environment, and frustrations she had including all of his behaviors including towards her.
When Ms. Jensen made her complaints and expressed the problems, Robbs retaliated against her;
threatened Ms. Jensen with termination; and continued with even more harassment and mockery,
including sarcastic and demeaning looks; and statements to her, with winks and more sexual
comments, harassment, intimidation, and offensive innuendos, advances, and quid pro quo
propositions, stating to Ms. Jensen, "I will give you whatever you want."  Ms. Jensen declined.

50.     During the above events, Robbs was in the position of power, authority, and
control over Ms. Jensen's job and promotion opportunities, and from there, Robbs used
transference, manipulation, perverted unjust power, and other methods with the intent to injure
Ms. Jensen all with a knowing, conscious and deliberate intent directed at Ms. Jensen with the
purpose of inflicting injury upon her, forcing her to be trapped, intimidated, scared for her safety
and well-being, and fearful of losing her job.

51.     After Robbs' further advances to Ms. Jensen were rejected, spurned, rebuffed, and
refused by Ms. Jensen, including through her complaints to XLEAR and Robbs and her protected
activities, XLEAR and Robbs took retaliatory action directed against her with the intent to injure

Ms. Jensen all with a knowing, conscious, and deliberate intent and expectation to cause, and with the purpose of causing and inflicting, further injury upon Ms. Jensen.

52.     Despite the representations, promises, and agreements with Ms. Jensen, XLEAR, including Robbs, engaged in continuing gender discrimination against, harassment of, and a continuing intolerable hostile work environment directed towards Ms. Jensen including after she complained.   XLEAR's outrageous behaviors and discrimination, harassment, hostile work environment, threats of termination, and retaliation, became so unreasonable, intolerable, and caused the altering of the terms, benefits, enjoyments, and conditions of Ms. Jensen's employment resulting in the active and/or constructive wrongful termination of Ms. Jensen's employment on or about April 18, 2018—all in direct violation of her rights and the express promises made to her, and in retaliation for her rejection of Robbs; her complaints of harassment; and in retaliation including for her protected activities.

53.     The conduct, behaviors, retaliation, and adverse action against Ms. Jensen would not have been taken by XLEAR but for Ms. Jensen's challenges against and opposition to the unlawful gender discrimination, sexual harassment, quid pro quo, hostile work environment, and retaliation, and/or her participation in protected activities.

54.     Unfortunately, XLEAR's behaviors also breached and did violence to XLEAR's promises and commitments, to Ms. Jensen, including:

      a.     That Ms. Jensen was impeded in the company;

      b.     That Ms. Jensen was not protected in her employment or physically;

      c.     That Ms. Jensen was not provided with all that is necessary from XLEAR, but was further retaliated against resulting in active and/or constructive wrongful termination.

**55.**     Instead of correcting and stopping the gender discrimination, sexual harassment, hostile work environment, and retaliation, XLEAR continued with intentional adverse actions and illegal behaviors.

**56.**     Up to the time of her termination, Ms. Jensen had performed and adhered to all of her requirements and obligations with XLEAR.

**57.**     Any conditions, covenants, or promises which Ms. Jensen has not performed was not performed as a result of Defendants' breaches, discriminatory, and illegal conduct excusing and preventing any such performance by Ms. Jensen.

**58.**     Since her termination, Ms. Jensen has made demands for Defendants to honor their legal obligations, promises, and agreements; however, Defendants have willfully stonewalled, failed and refused to do so, thus denying and cheating Ms. Jensen out of the fruits and benefits of her hard work and dedicated labors.

### E.     *Plaintiff Jessica McCartney*

**59.**     Plaintiff Ms. McCartney incorporates by reference the above allegations as if set forth fully herein in support of her claims, including those of unlawful gender discrimination, sexual harassment, hostile work environment, and retaliation.

**60.**     On November 27, 2017, Ms. McCartney, a female then-age 31, began her employment with XLEAR as a full-time Executive Assistant and Event and Trade Show Coordinator.

**61.**     While employed at XLEAR, Ms. McCartney was to be paid an annual salary of $55,000, commissions, bonuses, and other compensation.

**62.**     Robbs, then-age 48, an owner, officer (Vice President), proxy, and/or agent of XLEAR, was Mr. McCartney's immediate supervisor and a member of senior management.

**63.**     At or shortly after the time she was hired, Ms. McCartney began to be subjected to unwelcomed sexual harassment and an offensive, uncomfortable, inappropriate, toxic, and hostile work environment, including with Robbs acting willfully, intentionally, knowingly, and with an intent to injure and cause harm and distress to Ms. McCartney, with his:

■     Making unsolicited sexual comments directed about and at Ms. McCartney and her appearance and body and well as the same of other female co-workers.

■     Making unsolicited sexual comments directed about and at Ms. McCartney by Robbs who had brought into the workplace a Thera gun (a neuromuscular percussive therapy device that provides muscle activation, recovery, and pain relief) and acted as if it was a sexual vibrator and then intentionally stated directly to her that it should "not to put on genitalia/genitals, Jessica."

■     Making multiple unsolicited  sexual comments intended and directed about Ms. McCartney about other female employees including Ms. Jensen, whom Robbs stated he wanted to travel alone with, and stating multiple times that he viewed that Ms. Jensen was "hot" and "sexy", a "Booth Babe" for trade shows.

■     Making multiple unsolicited sexual comments creating and directed intentionally at and bringing Ms. McCartney in the middle of uncomfortable, unwelcomed, and a toxic and offensive environment about other female employees including Ms. Jensen, to the point Ms. McCartney would go home upset about the sexual

comments Robbs said today which were interfering with  Ms. McCartney's job and job performance.

64.     Others at XLEAR, including XLEAR'S Chief Executive Officer and owner, Nathan Jones ("Jones"), also willfully and knowingly make multiple uncomfortable sexual comments and innuendos intended to harass, injure and cause harm and distress and directed to Ms. McCartney in the workplace.   For example, while Ms. McCartney was doing her job preparing for an Efficient Collaborative Retail Marketing event ("ECRM"), Mr. Jones was eating some cashews and when Ms. McCartney asked for some, Mr. Jones intended and directed offensive comments to Ms. McCartney stating, "Oh, you want some of my nuts?" then laughed.

65.     On another occasion, Ms. McCartney was going to scan something for Mr. Jones when he knowingly and intentionally said additional sexual comments and innuendos directly to her in a sexually-suggesting manner, "Oh, you're going to do that for me?"

66.     During her employment, including in December 2017 and thereafter, Ms. McCartney was pregnant and suffered pregnancy complications, including for a disabling medical condition, a hemorrhage mass, a physical impairment that substantially limited Ms. McCartney's major life activities and which involved emergency medical treatment.

67.     Ms. McCartney informed XLEAR of her pregnancy conditions and told XLEAR of her pregnancy conditions.

68.     At work during her pregnancy, Ms. McCartney experienced stomach pains and labor symptoms.

69.     In March 2018, Ms. McCartney, while pregnant, was on a business trip to the Los Angeles, California area for an ExpoWest trade show.  Robbs was also there.

70.     While others, including Plaintiff Ms. McCartney, were setting up the trade show booth, assembling shelving, seating, displays which involved a lot of bending, Robbs was wandering around and while Ms. McCartney (pregnant) was bent over putting a drawer together, Robbs made unsolicited and unpermitted touching of Ms. McCartney's physical body striking and slapping Ms. McCartney on her buttocks knowingly and intentionally with intent to injure and cause harm and distress to Ms. McCartney.  Robbs then said, "I couldn't help it."   Ms. McCartney complained to Robbs about his behaviors, and specifically told Robbs "that's not okay."  In observing Robbs, one could tell that Robbs could see and knew that Ms. McCartney was upset.  Despite Ms. McCartney's complaints, the harassment, hostile work environment, and abuse did not stop but rather continued.

71.     Shortly after the ExpoWest tradeshow, Ms. McCartney learned that Mr. Jones (XLEAR'S Chief Executive Officer and an owner), Mr. Peter Vanderhoof ("Vanderhoof") (XLEAR'S Chief Financial Officer/Chief Operating Officer and Board of Directors Member), and Robbs (XLEAR'S Vice President and an owner) made demeaning and discriminatory statements about Ms. McCartney for her being pregnant stating that they should not have sent Ms. McCartney on the trip since she was pregnant; that "Jessica should not represent the company at shows because she's pregnant"; that "we shouldn't send a pregnant girl to trade shows".

72.     Ms. McCartney's pregnancy and pregnancy disabilities were a continuing issue of discriminatory treatment towards her with XLEAR, with multiple, constant, degrading and unwelcomed, unsolicited, and offensive comments intentionally directed to her, such as:

■   Multiple demeaning comments about Ms. McCartney's pregnancy, condition, and belly by Vanderhoof and others directed to and about her.

■   Comments by Vanderhoof directed to Ms. McCartney while she was working and saying to her and all those around: "Don't ask Jess if she's pregnant, it's just a big beer belly".

■   Comments by Robbs, referring to Ms. McCartney and her pregnancy: "So now I am stuck with an emotional pregnant girl".

■   Other belittling and hostile comments were made by Jones to Ms. McCartney, including: "I'll have you pray for me because I know I stand a chance, and another about whether Ms. McCartney drank wine.

■   Vanderhoof coming up behind Ms. McCartney and assaulting and battering without her permission or consent by grabbing her shoulders with a firm grip.

73.   All of the above events and treatment caused Ms. McCartney to struggle to perform her job and created a terrible, toxic, and hostile environment to work in.

74.   During the above events, Robbs, Jones, and Vanderhoof were in positions of power, authority, and control over Ms. McCartney's job and promotion opportunities, and from there, Robbs, Jones, and Vanderhoof used transference, manipulation, perverted unjust power, and other methods with the intent to injure Ms. McCartney all with a knowing, conscious and deliberate intent directed to Ms. McCartney with the purpose of inflicting injury upon her, forcing her to be trapped, scared, and fearful of losing her job.

75.   Despite the representations, promises, and agreements with Ms. McCartney, XLEAR, including Robbs, Jones, and Vanderhoof engaged in continuing gender discrimination

against, harassment, and a continuing intolerable hostile work environment directed towards Ms. McCartney including after she complained.  XLEAR's outrageous behaviors and discrimination, harassment, hostile work environment, and retaliation, became so unreasonable, intolerable, and caused the altering of the terms, benefits, enjoyments, and conditions of Ms. McCartney's employment resulting in the active and/or constructive wrongful termination of Ms. McCartney's employment on or about April 28, 2018—all in direct violation of her rights and the express promises made to her, and in retaliation for her voicing complaints of Robbs's behaviors; her complaints of harassment; and her protected activities.

76.     The conduct, behaviors, retaliation, and adverse action against Ms. McCartney would not have been taken by XLEAR but for Ms. McCartney's challenges against and opposition to the unlawful gender discrimination, sexual harassment, hostile work environment, pregnancy, disabilities, and retaliation, and/or her participation in protected activities.

77.     Unfortunately, XLEAR's behaviors also breached and did violence to XLEAR'S promises and commitments, to Ms. McCartney, including:

a.     That Ms. McCartney was impeded in the company;

b.     That Ms. McCartney was not protected in her employment and physically;

c.     That Ms. McCartney was not provided with all that is necessary from XLEAR.

78.     Instead of correcting and stopping the gender discrimination, sexual harassment, hostile work environment, and retaliation, XLEAR continued with intentional adverse actions and illegal behaviors.

**79.**     Up to the time of her termination, Ms. McCartney had performed and adhered to all of her requirements and obligations with XLEAR.

**80.**     Any conditions, covenants, or promises which Ms. McCartney has not performed was not performed as a result of Defendants' breaches, discriminatory, and illegal conduct excusing and preventing any such performance by Ms. McCartney.

**81.**     Since her termination, Ms. McCartney has made demands for Defendants to honor their legal obligations, promises, and agreements; however, Defendants have willfully stonewalled, failed and refused to do so, thus denying and cheating Ms. McCartney out of the fruits and benefits of her hard work and dedicated labors.

## V.  <u>CAUSES OF ACTION</u>

### <u>FIRST COUNT</u>

**(Violations of Civil Rights and Statutory Discrimination, including *Title VII and PDA*
all Plaintiffs: Gender / Sexual Harassment / Hostile Work Environment / Retaliation;
Ms. Jensen: Quid Pro Quo; Ms. McCartney: Pregnancy / *PDA*)
(Against Defendant XLEAR)**

**82.**     Plaintiffs incorporate by reference the above allegations as if set forth fully herein.

**83.**     From on or about November 27, 2017 to on or about April 18, 2018, Ms. Jensen was employed with Defendant XLEAR.

**84.**     From on or about November 27, 2017 to on or about April 28, 2018, Ms. McCartney was employed with Defendant XLEAR.

**85.**     Defendant XLEAR is an employer affecting commerce with more than 100 employees.

**86.** During their employment with XLEAR, Ms. Jensen and Ms. McCartney have been members of protected classes, including on the basis of their gender/sex (female), and Ms. McCartney's pregnancy("Protected Classes").

**87.** At all times during their employment with XLEAR, Ms. Jensen and Ms. McCartney were qualified for the positions each held and for those positions which have been denied to them.

**88.** During their employment, Ms. Jensen and Ms. McCartney were each objectively and subjectively, subjected to gender discrimination, severe and pervasive sexual harassment, hostile work environment, retaliation, and adverse employment action.   In the case of Ms. Jensen, she was also subjected to quid pro quo sexual discrimination and harassment.  In the case of Ms. McCartney, she was also subjected to pregnancy discrimination.  All of the above illegal behaviors negatively impacted and altered the terms and conditions of each of their respective employment, job opportunities, compensation, including based on their respective Protected Classes, and each was retaliated against for protected action engaged in by each.  Each suffered adverse action, including active  and/or constructive wrongful termination, all in violation of *Title VII of the Civil Rights Act of 1964*, 42 U.S.C. §§ 2000e-2(a), (k) *et seq. Title VII of the Civil Rights Act of 1964*, as amended ("*Title VII*"), 42 U.S.C. §§ 2000e-2(a)*, et seq.* for employment discrimination, including in the case of  Ms. McCartney as amended by *The Pregnancy Discrimination Act of 1978* ("*PDA*") (Pub.L. 95-555), Section 701 of *The Civil Rights Act of 1964*, subsection (k).

**89.** XLEAR adopted policies and standards against gender discrimination, sexual and other unlawful harassment, quid pro quo, hostile work environment, pregnancy discrimination,

retaliation of which XLEAR made promises to its employees and to Ms. Jensen and Ms. McCartney particularly, including which is set forth above, which XLEAR violated.

90.     XLEAR, including through Robbs, engaged in severe, pervasive, offensive, abusive, and retaliatory conduct to Ms. Jensen and Ms. McCartney, including as described herein, which violates the above statutes and law, and XLEAR's own policies and standards. Robbs acted wrongfully, and his conduct breached and fell below XLEAR's policies, standards, and expectations—in violation of XLEAR'S own written policies, including those prohibiting gender discrimination, sexual harassment, quid pro quo, hostile work environment, pregnancy discrimination—all of which resulted in interference with Ms. Jensen's and Ms. McCartney's Constitutional and civil rights; their employment and work performance; creating a hostile and abusive working environment and resulting in retaliation and termination.

91.     Ms. Jensen and Ms. McCartney complained to XLEAR and engaged in protective activities.  Following their protected activities, including notification to XLEAR of their complaints, including as set forth above, Ms. Jensen and Ms. McCartney were subjected to further gender and other forms of discrimination, sexual harassment, further hostile, abuse, a toxic work environment, and retaliation, thus violating and denying each of their rights.

92.     Ms. Jensen and Ms. McCartney were each treated less favorably than others not in their Protected Classes.  XLEAR allowed others, not in Ms. Jensen's and/or Ms. McCartney's Protected Classes, to engage in the same or similar conduct without being treated with adverse action like Ms. Jensen and Ms. McCartney were.

**93.** Ms. Jensen and Ms. McCartney are informed, believe and on that basis allege that persons not in their same Protected Classes were treated more favorably than they were, and were not treated like they were subjected to.

**94.** Although qualified for each of their positions, Ms. Jensen and Ms. McCartney were subjected to disparate treatment and disparate impact discrimination, and tangible adverse employment action when each was actively discriminated against, subjected to a hostile work environment, harassed, and denied job advantages, retaliated against, and terminated from their positions at XLEAR.

**95.** Ms. Jensen and Ms. McCartney each engaged in protected activities including with each of their complaints; however, each was retaliated against, subjected to adverse action, put in fear of reprisal, distraught, and subjected to adverse action because of and with the motivating factors being each of their Protected Classes status.

**96.** As a result of XLEAR'S actions and willful violation of each of their rights, Ms. Jensen and Ms. McCartney has each suffered irreparable injuries, including but not limited to loss of pay, compensation and other economic losses; and each is entitled to recover damages and relief, for emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity, loss of enjoyment of life, and other physical, mental, and intangible injuries for all of which each should be compensated, as well as for liquidated and punitive damages, *Eshelman* damages, pre-judgment and post-judgment interest, attorney fees, and costs, the exact amount to be shown at the time of trial.

**WHEREFORE,** Plaintiffs pray judgment as hereinafter set forth.

## SECOND COUNT

### (Civil Assault)
### (All Plaintiffs Against All Defendants)

**97.**     Plaintiffs incorporate by reference the above allegations as if set forth fully herein.

**98.**     Additionally, separately, apart from, standing alone, and/or alternatively from any employment discrimination, retaliation, and/or any *Title VII*, *PDA* and other claims in the First Count, Defendants, including XLEAR and Robbs, and/or each of them, jointly, severally, and individually, also perpetrated and engaged in harmful, offensive, assaulting conduct towards Ms. Jensen and Ms. McCartney, including physical conduct initiated by Robbs which was unwanted, unwelcomed, harmful, and damaging to Ms. Jensen and Ms. McCartney.

**99.**     Defendants, and/or each of them, knew or should have known that their threatened physical contact with Ms. Jensen and Ms. McCartney was unwanted, unwelcomed, harmful, and damaging to each of them.  XLEAR and Robbs took actions and behaviors directed against Ms. Jensen and Ms. McCartney with the intent and specific mental state to injure each of them all with a knowing, conscious, and deliberate intent with the knowledge, purpose and expectation of inflicting injury upon Ms. Jensen and Ms. McCartney as a consequence.

**100.**     Defendants', and/or each of their, actions were perpetrated in such a manner so as to cause Ms. Jensen and Ms. McCartney harm and suffering to each of them as a person individually physically, mentally, and emotionally, including fear of danger, and imminent apprehension of physical battery to each as well as physical and mental manifestations.

**101.**     Defendants', and/or each of their, actions, including the unpermitted assaulting behaviors of Robbs upon Ms. Jensen and Ms. McCartney, were intentional, not accidental.

102.     Defendants', and/or each of their, actions were unjustified, without Ms. Jensen's and/or Ms. McCartney's consent.

103.     As a result of Defendants', and/or each of their, actions, Ms. Jensen and Ms. McCartney each felt the imminent apprehension, fear, shock, anxiety, and fright of such contact, and was placed in great fear for each of their safety and well-being.

104.     Defendants, and each of them, knew or should have known that their threatened physical contact with Ms. Jensen and Ms. McCartney would cause both permanent emotional harm and permanent physical harm to each of them.

105.     As a direct and proximate result of the aforementioned actions by Defendants, and/or each of them, Ms. Jensen and Ms. McCartney has each sustained and will sustain injury damages including:

     a.     extreme and severe pain and suffering, both physical and mental;

     b.     economic damages, including bills and expenses for medical care and mental health counseling that Ms. Jensen and Ms. McCartney required and will require in the future;

     c.     a diminution in the ability and capacity to work, earn money and perform household and other services in the future; and

     d.     non-economic damages, including a loss of enjoyment of life.

**WHEREFORE,** Plaintiffs pray judgment as hereinafter set forth.

## THIRD COUNT

**(Civil Battery)**
**(All Plaintiffs Against All Defendants)**

106.     Plaintiffs incorporate by reference the above allegations as if set forth fully herein.

107.     Additionally, separately, apart from, standing alone, and/or alternatively from any employment discrimination, retaliation, and/or any *Title VII*, *PDA*, and other claims in the First Count, Defendants, including XLEAR and Robbs, and/or each of them, jointly, severally, and individually, also perpetrated and engaged in battery by making harmful and offensive physical and sexual contact upon Ms. Jensen and Ms. McCartney.

108.     Defendants', and/or each of their, actions towards Ms. Jensen and Ms. McCartney, including physical contact were unwanted, unwelcomed, harmful, and damaging to Ms. Jensen and Ms. McCartney.  XLEAR and Robbs took actions and behaviors directed against Ms. Jensen and Ms. McCartney with the intent and specific mental state to injure each of them all with a knowing, conscious, and deliberate intent with the knowledge, purpose and expectation of inflicting injury upon Ms. Jensen and Ms. McCartney as a consequence.

109.     Defendants, and/or each of them, knew or should have known that their intentional physical contact upon Ms. Jensen and Ms. McCartney was unwanted, unwelcomed, and damaging to each of them.

110.     Defendants', and/or each of their, actions were perpetrated in such a manner so as to cause Ms. Jensen and Ms. McCartney harm and suffering to each of them as a person individually physically, mentally, and emotionally, including shock, fear of danger to Ms. Jensen and Ms. McCartney.

111.     Defendants', and/or each of their actions were intentional, not accidental.

112.     Defendants', and/or each of their, actions were unjustified and without consent.

113.     Defendants, and/or each of them, knew or should have known that their intentional and/or reckless physical contact with Ms. Jensen and Ms. McCartney, including the

touching of Ms. Jensen's and Ms. McCartney's body and person, was unwanted, unwelcomed, harmful, offensive and/or damaging to each of them.

114.    Defendants, and/or each of them, knew or should have known that their intentional physical contact with Ms. Jensen and Ms. McCartney would cause both permanent emotional harm and permanent physical harm to each of them.

115.    As a direct and proximate result of the aforementioned actions by Defendants, and/or each of them, Ms. Jensen and Ms. McCartney has each sustained and will sustain injury damages including:

        a.    extreme and severe pain and suffering, both physical and mental;

        b.    economic damages, including bills and expenses for medical care and mental health counseling that Ms. Jensen and Ms. McCartney required and will require in the future;

        c.    a diminution in the ability and capacity to work, earn money and perform household and other services in the future; and

        d.    non-economic damages, including a loss of enjoyment of life.

**WHEREFORE,** Plaintiffs pray judgment as hereinafter set forth.

<u>**FOURTH COUNT**</u>

**(Negligence)**
**(Breach of Duties, Including Assumed Duties, Affirmative Duties)**
**(All Plaintiffs Against Defendant Robbs)**

116.    Plaintiffs incorporate by reference the above allegations as if set forth fully herein.

117.    Additionally, separately, apart from, standing alone, and/or alternatively from any employment discrimination, retaliation, and/or any *Title VII*, *PDA* and other claims in the First

Count, Defendant Robbs individually owed statutory and other legal duties to Ms. Jensen and Ms. McCartney, including, but not limited to:  Not to harm Ms. Jensen or Mr. McCartney; not to assault Ms. Jensen or Ms. McCartney; not to batter Ms. Jensen or Ms. McCartney; not to cause emotional distress to Ms. Jensen or Ms. McCartney.

118.   Defendant Robbs negligently or recklessly breached his duties of reasonable care to Ms. Jensen and Ms. McCartney, choosing instead to engage in, assist in, enable, and/or commit repeated negligent and reckless acts against Ms. Jensen and Ms. McCartney.

119.   Robbs's negligent or reckless conduct, directly, consequentially, and/or indirectly, constituted breaches of the duties Robbs owed Ms. Jensen and Ms. McCartney.

120.   As a direct and proximate result of the aforementioned actions by Robbs, Ms. Jensen and Ms. McCartney has each sustained and will sustain injury damages including:

a.   extreme and severe pain and suffering, both physical and mental;

b.   economic damages, including bills and expenses for medical care and mental health counseling that Ms. Jensen and Ms. McCartney required and will require in the future;

c.   a diminution in the ability and capacity to work, earn money and perform household and other services in the future; and

d.   non-economic damages, including a loss of enjoyment of life.

121.   Robbs's breaches of duties were substantial factors in Ms. Jensen's and Ms. McCartney's injuries and damages, the exact amount to be shown at the time of trial.

**WHEREFORE,** Plaintiffs pray judgment as hereinafter set forth.

## FIFTH COUNT

### (Negligent Infliction of Emotional Distress)
### (All Plaintiffs Against Defendant Robbs)

**122.**    Plaintiffs incorporate by reference the above allegations as if set forth fully herein.

**123.**    Additionally, separately, apart from, standing alone, and/or alternatively from any employment discrimination, retaliation, and/or any *Title VII*, *PDA* and other claims in the First Count, Defendant Robbs individually, engaged in outrageous conduct and acted with negligent and/or reckless disregard of the consequences of his conduct, acting in a negligent manner reasonably calculated to cause, or resulting in Ms. Jensen's and Ms. McCartney's severe emotional distress and physical and emotional anguish, fear, and injury.   Robbs's conduct, including described herein, has caused, and continues to cause, Ms. Jensen and Ms. McCartney severe emotional distress.

**124.**    As a direct and proximate result of the aforementioned actions by Robbs, Ms. Jensen and Ms. McCartney has each sustained and will sustain injury damages including:

      a.        extreme and severe pain and suffering, both physical and mental;

      b.        economic damages, including bills and expenses for medical care and mental health counseling that Ms. Jensen and Ms. McCartney required and will require in the future;

      c.        a diminution in the ability and capacity to work, earn money and perform household and other services in the future; and

      d.        non-economic damages, including a loss of enjoyment of life.

**WHEREFORE,** Plaintiffs pray judgment as hereinafter set forth.

## SIXTH COUNT

**(Intentional Infliction of Emotional Distress)**
**(All Plaintiffs Against All Defendants)**

**125.**   Plaintiffs incorporate by reference the above allegations as if set forth fully herein.

**126.**   Additionally, separately, apart from, standing alone, and/or alternatively from any employment discrimination, retaliation, and/or any *Title VII*, *PDA* and other claims in the First Count, Defendants, including XLEAR and Robbs, and/or each of them, jointly, severally, and individually, also engaged in intentional, atrocious, intolerable, and so extreme and outrageous conduct towards Ms. Jensen and Ms. McCartney as to exceed the bounds of decency.

**127.**   Defendants, and each of them individually, acted with the intent to inflict emotional distress, wantonly, or at a minimum acted with reckless disregard of the probability of causing emotional distress when it was certain or substantially certain that emotional distress would result from their conduct towards Ms. Jensen and Ms. McCartney.

**128.**   Defendants, and each of them individually, acted knowingly, intentionally (not accidentally), and/or purposefully, and sought to, and did harm and injure Ms. Jensen and Ms. McCartney, causing, and which continues to cause, each of them to suffer emotional distress, physical and emotional anguish, fear, and injury that is so severe that no reasonable person could be expected to endure it.

**129.**   As a direct and proximate result of the aforementioned actions by Defendants, and/or each of them, Ms. Jensen and Ms. McCartney has each sustained and will sustain injury damages including:

a.   extreme and severe pain and suffering, both physical and mental;

b.    economic damages, including bills and expenses for medical care and mental health counseling that Ms. Jensen and Ms. McCartney required and will require in the future;

c.    a diminution in the ability and capacity to work, earn money and perform household and other services in the future; and

d.    non-economic damages, including a loss of enjoyment of life.

**WHEREFORE,** Plaintiffs pray judgment as hereinafter set forth.

## VI.  PUNITIVE AND LIQUIDATED DAMAGES

### (Willful, Wanton, Malicious, Intent to Injure, Knowingly Reckless and/or Indifferent Conduct)
### (All Plaintiffs Against All Defendants)

**130.**    Plaintiffs incorporate by reference the above allegations as if set forth fully herein.

**131.**    As to those Counts allowing punitive damages against Defendants, and/or any of them, jointly, severally, or individually, whether under *Title VII*, *PDA* or otherwise, Ms. Jensen and Ms. McCartney are informed, believe, and on that basis allege, that the conduct of Defendants, including XLEAR and/or Robbs, was willful, wanton, malicious and/or reckless and/or with the intent to injure and/or knowing with reckless indifference toward, with knowledge of and a disregard of the *Title VII*, *PDA*, and other civil rights of Ms. Jensen and Ms. McCartney.   Defendants XLEAR and/or Robbs, and each of them jointly, severally, and individually, either intended to cause harm or, at a minimum, were recklessly indifferent to the injury that would likely result from their acts and omissions. Defendants XLEAR and/or Robbs took actions and behaviors directed against Ms. Jensen and Ms. McCartney with the intent and specific mental state to injure her all with a knowing, conscious, and deliberate intent with the knowledge, purpose and expectation of inflicting injury upon Ms. Jensen and/or Ms. McCartney

as a consequence.  Defendants' despicable conduct was done maliciously, fraudulently, and oppressively with a conscious, reckless, willful, and/or callous disregard of the probable detrimental consequences to Ms. Jensen and/or Ms. McCartney, and knowing that Defendants', and/or each of their, conduct was substantially certain to vex, annoy, and injure Ms. Jensen and Ms. McCartney, and entitling Ms. Jensen and Ms. McCartney to punitive damages in an amount appropriate to punish or set an example of Defendants XLEAR and/or Robbs, and each of them jointly, severally, and individually.

## VII.  **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that the Court enter a judgment against each of the Defendants, jointly, severally, and individually:

**As to the First Count for Violations of Civil Rights and Statutory Discrimination, including *Title VII and PDA* (all Plaintiffs: Gender / Sexual Harassment / Hostile Work Environment / Retaliation; Ms. Jensen: Quid Pro Quo; Ms. McCartney: Pregnancy / *PDA*), against Defendant XLEAR:**

1.     For general damages according to proof;

2.     For special and compensatory damages in a sum according to proof;

3.     For back pay and future pay;

4.     For equitable, declaratory, injunctive relief, including reinstatement;

5.     For liquidated and punitive damages in an amount sufficient to punish Defendant;

6.     For pre-judgment and post-judgment interest at the maximum rate allowed by law;

7.     For attorney fees, costs, and expenses incurred herein;

8.     For *Eshelman* damages; and

9.      For such other and further relief as the Court deems just and proper.

**As to the Second Count for Civil Assault, all Plaintiffs against all Defendants:**

1.      For general damages in a sum according to proof;

2.      For compensatory and special damages in a sum according to proof;

3.      For punitive damages in an amount sufficient to punish Defendants;

4.      For pre-judgment and post-judgment interest at the maximum rate allowed by law;

5.      For attorney fees if permitted by law and costs of suit incurred herein; and

6.      For such other and further relief as the Court deems just and proper.

**As to the Third Count for Civil Battery, all Plaintiffs against all Defendants:**

1.      For general damages in a sum according to proof;

2.      For compensatory and special damages in a sum according to proof;

3.      For punitive damages in an amount sufficient to punish Defendants;

4.      For pre-judgment and post-judgment interest at the maximum rate allowed by law;

5.      For attorney fees if permitted by law and costs of suit incurred herein; and

6.      For such other and further relief as the Court deems just and proper.

**As to the Fourth Count for Negligence (Breach of Duties, including Assumed Duties, Affirmative Duties), all Plaintiffs against Defendant Robbs:**

1.      For general damages in a sum according to proof;

2.      For compensatory and special damages in a sum according to proof;

3.      For pre-judgment and post-judgment interest at the maximum rate allowed by law;

4.      For their costs of suit incurred herein; and

5.      For such other and further relief as the Court deems just and proper.

**As to the Fifth Count for Negligent Infliction of Emotional Distress, all Plaintiffs against Defendant Robbs:**

1.  For general damages according to proof;

2.  For special and compensatory damages in a sum according to proof;

3.  For pre-judgment and post-judgment interest at the maximum rate allowed by law;

4.  For costs incurred herein; and

5.  For such other and further relief as the Court deems just and proper.

**As to the Sixth Count for Intentional Infliction of Emotional Distress all Plaintiffs against all Defendants:**

1.  For general damages according to proof;

2.  For special and compensatory damages in a sum according to proof;

3.  For punitive damages in an amount sufficient to punish Defendants;

4.  For pre-judgment and post-judgment interest at the maximum rate allowed by law;

5.  For costs incurred herein; and

6.  For such other and further relief as the Court deems just and proper.

## VIII.  <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand and exercise their Constitutional rights to a jury trial.

DATED this 17th day of June 2019          **ANDRUS LAW FIRM, LLC**


                                          BY:  /s/ Randy M. Andrus
                                          **RANDY M. ANDRUS**
                                          *Attorney for Plaintiffs*
                                          **BAYLEE JENSEN**
                                          **JESSICA McCARTNEY**