# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **BAYLEE JENSEN and JESSICA McCARTNEY,**<br><br>**Plaintiffs,**<br><br>vs.<br><br>**XLEAR, INC.; WILLIAM ROBBS; and DOES 1 through 50, inclusive,**<br><br>**Defendants.** | **MEMORANDUM DECISION AND ORDER GRANTING IN PART DEFENDANT XLEAR, INC.'S PARTIAL MOTION TO DISMISS PLAINTIFFS' STATE LAW CLAIMS AND DENYING PLAINTIFFS' MOTION TO DISMISS WILLIAM ROBBS'S COUNTERCLAIMS**<br><br>**Case No. 2:19-cv-413**<br><br>**Judge Clark Waddoups** |
| **WILLIAM ROBBS,**<br><br>**Counter Claimant,**<br><br>vs.<br><br>**BAYLEE JENSEN and JESSICA McCARTNEY,**<br><br>**Counter Defendants.** | |

Before the court are motions to dismiss filed by defendant Xlear, Inc. ("Xlear") and counter-claim defendants Baylee Jensen and Jessica McCartney (collectively "Plaintiffs"). Xlear moves, by a Partial Motion to Dismiss, to dismiss Plaintiffs' state law claims of civil assault, civil battery, and intentional infliction of emotional distress (ECF No. 11), and Plaintiffs move to dismiss counterclaims filed by defendant William Robbs ("Mr. Robbs") for defamation and tortious interference with a contract (ECF No. 28). For the reasons stated herein, Xlear's partial motion to dismiss is **GRANTED IN PART**, and Plaintiffs' motion to dismiss is **DENIED**.

## BACKGROUND

Plaintiffs Baylee Jensen ("Ms. Jensen") and Jessica McCartney ("Ms. McCartney" and together with Ms. Jensen, "Plaintiffs") each began working for defendant Xlear, Inc. ("Xlear") on November 17, 2017.  Although Ms. Jensen was hired as the E-Commerce sales manager and Ms. McCartney was hired as an executive assistant and event and trade show coordinator, they were both immediately supervised by defendant William Robbs ("Mr. Robbs").  At all relevant times, Mr. Robbs was an owner and vice president of Xlear.  Plaintiffs allege that throughout the courses of their employments, Mr. Robbs made inappropriate and/or demeaning comments and innuendos to them and inappropriately touched them in violation of their rights and Xlear's policies.  Ms. McCartney, who was pregnant for at least a portion of her employment, also alleges that Mr. Robbs made demeaning comments regarding her pregnancy and that he and other officers discriminated against her because she was pregnant.

Plaintiffs filed their Complaint in this action on June 17, 2019.  (ECF No. 2).  Against Xlear, they bring claims under Title VII as well as claims of civil assault, civil battery, and intentional infliction of emotional distress ("IIED") (collectively the "State Law Claims").  Against Mr. Robbs, Plaintiffs assert claims of civil assault, civil battery, negligence, negligent infliction of emotional distress, and IIED.

Mr. Robbs resigned from Xlear in June 2018.  In September 2018, he accepted a job as a director for Weider Global Nutrition ("Weider").  While he anticipated working in Weider's office in Hamburg, Germany, at all relevant times, he was actually stationed in Phoenix, Arizona.  On June 19, 2019, Plaintiffs' counsel, Randy Andrus ("Mr. Andrus") sent Mr. Robbs, at his personal email address, a request for waiver of service of process for this action (the "June 19 Email").  That email stated that the request was designed "[t]o reduce costs to my Clients'

2

end, and inconvenience, disruption or embarrassment on your end" and gave Mr. Robbs five

days to respond.  On June 25, 2019, Mr. Andrus sent a second email to Mr. Robbs to which the

Summons and Complaint filed in this matter were attached (the "June 25 Email").  This email

was also sent to two Weider corporate email addresses: info@joe-weider.com and

online@weider.com.  Mr. Andrus also sent a hard copy of the Summons and Complaint

addressed to Mr. Robbs at Weider's Hamburg office (the "Mailing").  This package was

ultimately forwarded to Mr. Robbs in Phoenix, but someone at the Hamburg office had already

opened it.  Mr. Robbs was asked to resign from his position at Weider in July of 2019, allegedly

because of the allegations contained in the Complaint.  Based on the June 25 Email and the

Mailing, he now asserts Counterclaims against Plaintiffs for defamation and tortious interference

with a contract.

## DISCUSSION

Before the court are Xlear's Partial Motion to Dismiss, which seeks to dismiss Plaintiff's

State Law Claims against it, and Plaintiffs' Motion to Dismiss Mr. Robbs's counterclaims for

defamation and tortious interference with a contract.  Both motions have been fully briefed, and

the court heard argument on the same on March 5, 2020.

## I.      Defendant Xlear's Motion to Dismiss the State Law Claims is granted in part.

Xlear argues that the State Law Claims should all be dismissed because Plaintiffs have

failed to plead facts sufficient to support a claim that it is liable for Mr. Robbs's conduct and

because the claims are preempted by the Utah Antidiscrimination Act ("UADA") and/or the

Utah Workers Compensation Act ("UWCA").  Xlear also moves to dismiss Plaintiffs' IIED

claim on the basis that Plaintiffs have not shown that Xlear engaged in any extreme or

outrageous conduct.

**A.** **Plaintiffs' claims for assault and battery fail because Plaintiffs have not established that Xlear is directly or vicariously liable for Mr. Robbs's tortious actions.**

Plaintiffs' claims of civil assault and civil battery arise out of allegations that Mr. Robbs brushed up against and physically touched Ms. Jensen, touched Ms. Jensen's "body and buttocks using a Thera gun," and struck and slapped Ms. McCartney on the buttocks. (*See* ECF No. 2 at ¶¶ 39, 41, 48, 70). Xlear moves to dismiss these claims, arguing that the underlying bad actions were performed exclusively by Mr. Robbs and that Plaintiffs have failed to establish that it is legally responsible for Mr. Robbs's conduct. Plaintiff argues that Xlear "jointly, severally, and individually . . . perpetrated and engaged in" the alleged assaults and batteries and that it, itself, is the "bad actor in this case." (*See* ECF No. 2 at ¶¶ 98, 107; ECF No. 22 at 9).

Under Utah law, "[c]orporations can only act through agents, be they officers or employees." *Lane v. Provo Rehab. & Nursing*, 2018 UT App 10, ¶ 27, 414 P.3d 991, 997, *cert. denied*, 421 P.3d 441 (Utah 2018) (citations and quotations omitted); *see also* Restatement (Third) of Agency § 7.03 ("A principal that is not an individual can take action only through its agents, who typically are individuals."). Although a corporation can only act through its agents, it is not automatically liable for every action that its agents take, especially tortious ones. *See* Restatement (Third) Of Agency § 7.03 (2006) ("A principal that is not an individual can take action only through its agents, who typically are individuals. . . . An organization's tortious conduct consists of conduct by agents of the organization that is attributable to it."). Rather, for such liability to exist, the nature of the relationship between the corporation and agent must be sufficient for either direct or vicarious liability to exist. *See Mallory v. Brigham Young Univ.*, 2012 UT App 242, ¶ 29, 285 P.3d 1230, 1238, *rev'd on other grounds by*, 2014 UT 27, 332 P.3d 922 (noting that "a principal can be sued for direct or vicarious liability as a result of the actions of its agent" (citing

4

Restatement (Third) Of Agency § 7.03)); *see also Allen v. Prudential Prop. & Cas. Ins. Co.*, 839 P.2d 798, 805–06, n. 16 (Utah 1992).

Direct liability arises "'from the principal's relationship with [the] agent whose conduct harms a third party,'" "'from the agent's failure to perform a duty owed by the principal to the third party,'" or "from the principal's own negligence in selecting or supervising the agent." *Mallory*, 2012 UT App 242, ¶ 29, 285 P.3d at 1238 (quoting Restatement (Third) Of Agency § 7.03). A principal's relationship with its agent gives rise to direct liability when the agent "acts with actual authority in committing a tort, that is, when the agent reasonably believes, based on a manifestation of the principal, that the principal wishes the agent so to act." *See* Restatement (Third) Of Agency § 7.03; *see also Parker v. Carilion Clinic*, 296 Va. 319, 343, 819 S.E.2d 809, 823 (2018) ("A corporate defendant may be liable as a primary tortfeasor (independent of *respondeat superior* liability) if it authorized, directed, ratified, or performed the tortious conduct through those who, under the governing management structure, had the discretionary authority to act on behalf of the corporation.").

Vicarious liability can arise when an agent "'commits a tort while acting within the scope of employment.'" *Id.* (quoting Restatement (Third) Of Agency § 7.03); *see also Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶ 19, 61 P.3d 1009, 1015 ("Under principles of vicarious liability, a principal is held responsible for the tortious acts of an agent acting within the scope of the agent's authority." (citations omitted)). Under Utah law, the doctrine of *respondeat superior* is the primary means used to determine whether vicarious liability exists. *See Newman v. White Water Whirlpool*, 2008 UT 79, ¶ 8, 197 P.3d 654, 657 ("Under the doctrine of *respondeat superior*, an employer may be held vicariously liable for the acts of its employee if the employee is in the course and scope of his employment at the time of the act giving rise to the injury." (citing

*Christensen v. Swenson,* 874 P.2d 125, 127 (Utah 1994))); *see also M. J. v. Wisan*, 2016 UT 13, ¶ 50, 371 P.3d 21, 30 ("*Respondeat superior* is a doctrine of the common law of agency. The basic question presented under this doctrine is whether to treat the torts of an agent as the acts of the principal. The arguments in favor of extending such liability include fairness to injured parties and deterrence of tortious activity.").

In its Partial Motion to Dismiss, Xlear relies on the doctrine of *respondeat superior* to argue that it is not vicariously liable for Mr. Robbs's alleged assaults and batteries. Plaintiffs respond by asserting that Xlear is directly liable for those actions because the company itself is the "bad actor in this case." (*See* ECF No. 22 at 9).

1. *Plaintiffs have failed to plead sufficient facts to show that Xlear can be held vicariously liable for Mr. Robbs's alleged assaults and batteries.*

Utah courts apply a three-factor test to govern whether an agent's actions were conducted in the course and scope of his employment: "(1) whether the agent's conduct is 'of the general kind the agent is employed to perform'; (2) whether the agent is acting 'within the hours of the agent's work and the ordinary spatial boundaries of the employment'; and (3) whether the agent's acts were 'motivated, at least in part, by the purpose of serving the principal's interest.'" *M. J.*, 2016 UT 13 at ¶ 54, 371 P.3d at 31 (*quoting Birkner v. Salt Lake Cty.*, 771 P.2d 1053, 1057 (Utah 1989)). If the weight of these three factors indicate that a tortious action occurred within the scope of the agent's employment, the principal may be found vicariously liable for those actions.

Under the first factor "an employee's acts or conduct must be generally directed toward the accomplishment of objectives within the scope of the employee's duties and authority, or reasonably incidental thereto. In other words, the employee must be about the employer's business and the duties assigned by the employer, as opposed to being wholly involved in a personal endeavor." *Birkner*, 771 P.2d at 1057. In *Birkner*, the Supreme Court of Utah determined "as a

matter of law that a social worker's sexual interaction with a client he met through a 'crisis line' maintained by Salt Lake County was not a matter within the course of his employment with the county." *M. J.*, 2016 UT 13 at ¶ 54, 371 P.3d at 31 (citing *Birkner*, 771 P.2d at 1057).  While the *Birkner* court recognized that its conclusion was "supported by rulings in other jurisdictions holding as a matter of law that the sexual misconduct of an employee is outside the scope of employment," the Supreme Court of Utah has declined to adopt such a bright-line rule.  *Birkner*, 771 P.2d at 1058 (citations omitted).  Rather, in *M. J.* it expressly rejected an "invitation to rule as a matter of law that the sexual activity of an agent can never be a matter within the scope of employment" and instead recognized that "[i]n at least some circumstances the contrary conclusion is possible."  *M. J.*, 2016 UT 13 at ¶ 61, 371 P.3d at 33.  Thus, the first factor of the *respondeat superior* test requires the court to examine the nature of an agent's scope of employment to determine if it included the agent's sexual activity.[1]

Here, Plaintiffs allege that Mr. Robbs was an owner of Xlear, a member of the company's senior management, and Plaintiffs' immediate supervisor, but they fail to allege what his specific employment duties were.  (ECF No. 2 at ¶¶ 30, 62).  Plaintiffs do, however, represent that Xlear had in place at all relevant times "no-tolerance anti-harassment, anti-retaliation, and harassment-free environment policies expressly prohibiting any form of unlawful harassment by anyone, including any supervisory personnel, co-worker, vendor, client, or customer, that is sexual in nature . . . ." and that Mr. Robbs's actions violated those policies.  (*See* ECF No. 2 at ¶¶ 26–27, 89–90).  Thus, the only facts before the court that relate to whether Mr. Robbs's actions were

---

[1]  The court notes that the only instance in which Utah courts have found that an agent's sexual activity could potentially be found to be within an agent's scope of employment was based on a scenario which, by the Supreme Court of Utah's recognition, was "unique."  *See M. J.*, 2016 UT 13 at ¶ 62, 371 P.3d at 33.

within the scope of his employment show that those actions were expressly prohibited by Xlear. On such pleadings the court must conclude that Mr. Robbs's alleged assaults and batteries were not actions "'of the general kind [he was] employed to perform'" and that the first factor therefore weighs against a finding of *respondeat superior*. *See M. J.*, 2016 UT 13 at ¶ 54, 371 P.3d at 31 (citations omitted).

The second factor considers whether the allegedly tortious conduct occurred during work. The Supreme Court of Utah has recognized that "in today's business world much work is performed for an employer away from a defined work space and outside of a limited work shift," and that as such, under this factor "an agent need not be acting 'within the hours of the employee's work and the ordinary spatial boundaries of the employment'" in order to be acting within the course of his employment." *Id.* at ¶ 59, 371 P.3d at 32 (quoting *Birkner,* 771 P.2d at 1057). Here, because the alleged assaults and batteries were committed at work trade-shows, the second factor weighs in Plaintiffs' favor.

The final factor analyzes whether Mr. Robbs's actions were "motivated, at least in part, by the purpose of serving [Xlear's] interest." *Id.* at ¶ 54, 371 P.3d at 31. Under this factor, "an employee's purpose or intent, however misguided in its means, must be to further the employer's business interests," and if "the employee acts 'from purely personal motives . . . in no way connected with the employer's interests' or if the conduct is 'unprovoked, highly unusual, and quite outrageous,' then the master is not liable." *Birkner*, 771 P.2d at 1057 (citations omitted). While the Supreme Court of Utah has recognized that "[a] number of courts have . . . questioned the viability" of this factor, it has not rejected its application. *M. J.*, 2016 UT 13 at ¶ 54, 371 P.3d at 31. Rather, the court seems to support the Third Restatement's maintenance of this element, which states that "'[a]n employee's act is not within the scope of employment when it occurs within an

8

independent course of conduct not intended by the employee to serve any purpose of the employer.'" *Id.* at ¶ 56, 371 P.3d at 31 (quoting Restatement (Third) of Agency § 7.07(2)).

Again, underlying Plaintiffs' claims of assault and battery are their allegations that Mr. Robbs brushed up against and physically touched Ms. Jensen, touched Ms. Jensen's "body and buttocks using a Thera gun," and struck and slapped Ms. McCartney on the buttocks. (*See* ECF No. 2 at ¶¶ 39, 41, 48, 70). The only facts provided in the Complaint on which the court can analyze why Mr. Robbs performed these actions is Plaintiffs' assertion that after Mr. Robbs slapped Ms. McCartney on the buttocks, he said "I couldn't help it." (*See id.* at ¶¶ 48, 70). This seems to be an admission from Mr. Robbs's that his action was "purely personal." *See Birkner*, 771 P.2d at 1057. While the court can infer, from allegations that Mr. Robbs made comments that Ms. Jensen was a "'Booth Babe' for trade shows," that Mr. Robbs, and possibly Xlear, desired to have physically attractive female employees attend trade shows, it cannot reasonably draw from that inference the further, and more attenuated, inference that Mr. Robbs's assault and battery on Plaintiffs was motivated, even in part, by the purpose of ensuing that Xlear would maintain such employees. *See M. J.*, 2016 UT 13 at ¶ 54, 371 P.3d at 31. Rather, while it can be inferred that Mr. Robbs's allegedly predatorial actions were made possible by Xlear's desire to employ attractive females, those actions were clearly contrary to Xlear's goals of retaining such employees. There are therefore no facts before the court that indicate that Mr. Robbs's actions were performed for any goals other than to further his own "selfish personal gratification." *See D.C. v. Hasratian*, 304 F. Supp. 3d 1132, 1140 (D. Utah 2016). The third factor therefore weighs in Xlear's favor.

Of Utah's three factor test for determining whether an agent's actions were conducted in the course and scope of his employment, two factors weigh in Xlear's favor. Moreover, the one

9

factor that weighs in Plaintiffs' favor "does not tip the scales in favor of *respondeat superior* liability if the misconduct is not related to employment duties." *See id.* at 1139–40. In sum, Plaintiffs have failed to put forward facts and pleadings sufficient to show that Mr. Robbs's alleged assault and battery were within the scope of his employment, and as such, they have failed to establish that Xlear can be held vicariously liable for those actions.

2.   <em><u>Plaintiffs have failed to plead sufficient facts to show that Xlear can be held directly<br>liable for Mr. Robbs's alleged assaults and batteries.</u></em>

Plaintiffs argue that Xlear is liable for Mr. Robbs's actions under a theory of direct liability, asserting that "[t]he bad actor in this case was the company, Xlear" that "[t]he bad behaviors are the corporation's itself, not employees," and that "[v]icarious liability is not applicable as the relevant direct intentional tortfeasor is Xlear itself." (*See* ECF No. 22 at p. 17). But the facts underlying Plaintiffs' assault and battery claims do not support these assertions. Rather, as discussed above, those facts show that the alleged assaults and batteries were performed solely by Mr. Robbs. (ECF No. 2 at ¶¶ 39, 48, 70). Thus, Plaintiffs' position appears to be that because Mr. Robbs was an officer of Xlear, his actions were those of the company. (*See* ECF No. 22 at p. 9, n. 2 ("Xlear's corporate officers, directors, principals, and proxies, as alleged, were Xlear and were motivated by and acting in furtherance of Xlear's purposes.")). Plaintiffs' position ignores the principles of agency that govern the interpretation of corporate actions. As discussed above, a principal is not liable for every action its agents perform. When the principal is a corporation, this is true regardless of whether the agent is a vice president or the lowest level administrator.

A corporation can be found directly liable for the actions of its agents if the liability arises out of its relationship with the agent, if the agent "'fail[ed] to perform a duty owed by the principal to the third party,'" or if the corporation was negligent "in selecting or supervising the agent." *See Mallory*, 2012 UT App 242 at ¶ 29, 285 P.3d at 1238 (quoting Restatement (Third) Of Agency §

7.03).  Plaintiffs' allegations of assault and battery do not implicate the second or third avenues of liability and instead appear to rely on Mr. Robbs's relationship with Xlear.  A principal's relationship with its agent gives rise to direct liability when the agent "acts with actual authority in committing a tort, that is, when the agent reasonably believes, based on a manifestation of the principal, that the principal wishes the agent so to act."  *See* Restatement (Third) Of Agency § 7.03.  Plaintiffs fail to offer facts or allegations suggesting that Xlear gave Mr. Robbs actual authority to assault and batter them or that Mr. Robbs believed, reasonably or unreasonably, that Xlear wished him to assault or batter them.[2]  Rather, the only relevant facts before the court are that Xlear expressly prohibited Mr. Robbs from taking such action, as it adopted, and applied to Mr. Robbs, a strict anti-harassment policy.  (*See* ECF No. 2 at ¶¶ 26–27, 89–90).  Plaintiffs' Complaint therefore fails to state facts that are sufficient to establish that Mr. Xlear can be held directly liable for Mr. Robbs's alleged assaults and batteries.  These claims are therefore dismissed.

### B.  Portions of Plaintiffs' claim for Intentional Infliction of Emotional Distress fail, because the underlying allegations are preempted by the UADA or because Xlear's alleged actions are not, as a matter of law, "outrageous."

Plaintiffs' Complaint is not particular as to the acts they claim meet the elements for pleading their claim of IIED.  In response to Xlear's Partial Motion to Dismiss, Plaintiffs point to 77 paragraphs that they claim support their IIED claim, five of which are conclusory statements that Plaintiffs sustained and will sustain "extreme and severe pain and suffering, both physical and mental" (*see* ECF No. 2 at ¶¶ 105.a, 115.a, 120.a, 124.a, and 129.a), and 68 are offered as one large block (and make up approximately half of the Complaint).  After Plaintiffs' conclusory

---

[2]  While Plaintiffs allege that Xlear knew of previous improper behavior committed by Mr. Robbs's before he assaulted and battered Plaintiffs, even when accepted as true, such an allegation cannot be read as supporting an assertion that Mr. Robbs believed that Xlear wished him to assault and batter Plaintiffs. Xlear's alleged knowledge of, and failure to act on, Mr. Robbs's conduct is, however, relevant to Plaintiffs' claim for IIED, as discussed below.

pleadings are disregarded by the court, Plaintiffs' IIED claim can be read as alleging that Xlear committed four wrongful actions: 1) it knew that Mr. Robbs had a history of acting inappropriately toward female employees under his supervision but did not control, warn them of, nor protect them from, Mr. Robbs; 2) it discriminated against Plaintiffs; 3) it retaliated against Plaintiffs; and 4) it breached its employment agreement with Plaintiffs.

To prevail on these allegations, and thus their claim for IIED, for each, Plaintiffs must show that: (1) Xlear's conduct was outrageous and intolerable; (2) Xlear intended to cause them emotional distress; (3) they suffered severe emotional distress; and (4) Xlear's conduct proximately caused Plaintiffs' emotional distress. *See Wilson v. Sanders*, 2019 UT App 126, ¶ 18, 447 P.3d 1240, 1246 (citations omitted). "'To be considered outrageous, the conduct must evoke outrage or revulsion; it must be more than unreasonable, unkind, or unfair.'" *Cabaness v. Thomas*, 2010 UT 23, ¶ 38, 232 P.3d 486, 500 (quoting *Franco v. The Church of Jesus Christ of Latter-day Saints*, 2001 UT 25, ¶ 28, 21 P.3d 198). Further, as discussed above, a corporation acts through its agents, and depending on the nature of the actions and the relationship between the corporation and agent, may be found liable, either directly or vicariously, for an agent's harmful actions. A movant is required to prove that the actions and/or relationship between the principal and agent establish such liability.

1. *Plaintiffs' allegation that Xlear knew of Mr. Robbs's history but did not control, warn them of, or protect them from, him survives Xlear's Partial Motion to Dismiss.*

Plaintiffs' first assert that officers of Xlear knew that Mr. Robbs had previously sexual harassed and acted inappropriately towards female employees but failed to control him and "failed to warn or protect [them] of and from [Mr.] Robbs's sexual harassment and behaviors . . . ." (*See* ECF No. 2 at ¶¶ 25—27). Plaintiffs allege that Xlear therefore "knew or expected that injury would be caused . . . towards women, including Plaintiffs" but "[i]nstead of correcting and stopping

the gender discrimination, sexual harassment, hostile work environment, and retaliation, [Xlear] continued with intentional adverse actions and illegal behaviors."  (*See id.* at ¶¶ 25–27, 78).

Again, Plaintiffs' allegations rely on a theory of direct liability—that Xlear had knowledge of Mr. Robbs's past but failed to properly control him or warn or protect others from him.  (*See* ECF No. 22 at p. 17 ("The bad actor in this case was the company, Xlear.  The bad behaviors are the corporation's itself, not employees.")).  However, unlike with their claims of assault and battery, these allegations reference actions that can potentially be read as attributable to Xlear. Although Plaintiffs' Complaint lacks specificity as to what officers of Xlear had knowledge of Mr. Robbs's past actions, and what exactly they knew, it sufficiently alleges that Mr. Robbs was an officer of Xlear and that he had personal knowledge of his own prior inappropriate actions.  Under Utah law, that knowledge was imputed onto Xlear.  *See Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶ 16, 61 P.3d 1009, 1014 ("[T]he knowledge of an agent concerning the business which he is transacting for his principal is to be imputed to his principal." (quotations and citations omitted)); *see also Lane v. Provo Rehab. & Nursing*, 2018 UT App 10, ¶ 28, 414 P.3d 991, 997–98, *cert. denied*, 421 P.3d 441 (Utah 2018).  Thus, Plaintiffs have, at this stage, sufficiently shown that Xlear knew of Mr. Robbs's prior actions, and Xlear can therefore be potentially be found directly liable for its alleged failure to prevent Mr. Robbs from perpetuating similar bad acts against Plaintiffs here.  *See Mallory*, 2012 UT App 242, ¶ 29, 285 P.3d at 1238 (noting that direct corporate liability can arise "from the principal's own negligence in selecting or supervising the agent").

Under Utah law, "it is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery," but "where reasonable men may differ, it is for the jury, subject to the control of the

court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Cabaness*, 2010 UT 23 at ¶ 36, 232 P.3d at 499 (internal citations, quotations, and edits omitted). This court has expressly recognized that "[f]ailing to stop sexual harassment by another . . . does not give rise to an intentional infliction of emotional distress claim." *Peterson v. SCIS Air Sec. Corp.*, No. 2:16-cv-849, 2017 WL 943923, at *3 (D. Utah Mar. 9, 2017) (citing *Cabaness*, 232 P. 3d at 499). The court generally agrees with this conclusion, noting that the underlying allegation at issue here—that Xlear knew that Mr. Robbs presented a risk to females he supervised but failed to control him or protect Plaintiffs from him—more appropriately resembles a claim for negligence than for intentional infliction of emotional distress. However, the court finds that facts pled by Plaintiffs allege that Xlear's failures were continuous and ongoing and could thus constitute more than simple corporate negligence. *See Cabaness*, 2010 UT 23 at ¶ 38, 232 P.3d at 500 (recognizing that "while a single insult, indignity, or threat may not give rise to liability for intentional infliction of emotional distress, a continuous and ongoing pattern of the same may constitute extreme, intolerable, and outrageous conduct and thus result in liability." (citing *Retherford v. AT & T Communications*, 844 P.2d 949, 975–76, 978 (Utah 1992))).

When Plaintiffs' allegation that Xlear knew that Mr. Robbs presented a risk to, but nevertheless failed to protect, female employees is read together with their allegations that Mr. Robbs "was in the position of power, authority, and control over [Plaintiffs'] job[s] and promotion opportunities," and "used transference, manipulation, perverted unjust power, and other methods with the intent to injure [them]," forcing them "to be trapped, intimidated, scared for [their] safety and well-being, and fearful of losing [their] job[s]," a reasonable juror could determine that Xlear allowed Mr. Robbs to retain a position of power, knowing that he exploited that power to prey on

employees.  (*See* ECF No. 2 at ¶ 50).  That reasonable juror could also conclude that Xlear's actions were "so extreme and outrageous as to permit recovery" for IIED.  *See Cabaness*, 2010 UT 23 at ¶ 36, 232 P.3d at 499.  Accepting the alleged facts as true and drawing all inferences in Plaintiffs' favor, the court concludes, at this stage of the proceedings, that by knowing that Mr. Robbs had a history of performing inappropriate actions towards female employees under his supervision but nonetheless allowing him to remain a supervisor to such employees, Xlear engaged in "outrageous conduct" that could support a claim for IIED.

Xlear argues, as an alternate grounds for dismissal, that this claim should not proceed as it is preempted by the Utah Antidiscrimination Act ("UADA") and/or the Utah Workers Compensation Act ("UWCA").

> a. <u>The UADA does not preempt Plaintiffs' claim that Xlear failed to control, warn them of, or protect them from, Mr. Robbs.</u>

The UADA provides that its procedures are "the exclusive remedy under state law for employment discrimination based upon: (a) race; (b) color; (c) sex; (d) retaliation; (e) pregnancy, childbirth, or pregnancy-related conditions; (f) age; (g) religion; (h) national origin; (i) disability; (j) sexual orientation; or (k) gender identity."  UTAH CODE § 34A-5-107(15).  The Supreme Court of Utah has recognized that this provision was intended to "completely blanket the field of employment law in Utah" and therefore precludes "all common law causes of action for discrimination, retaliation, or harassment by an employer on the basis of sex, race, color, pregnancy, age, religion, national origin, or disability."  *Gottling v. P.R. Inc.*, 2002 UT 95, ¶ 9, 61 P.3d 989, 992–93, 97 (quoting *Retherford v. AT & T Commc'ns of Mountain States, Inc.*, 844 P.2d 949, 961 (Utah 1992)).

In determining whether a claim is preempted by the UADA, Utah courts apply the "indispensable element test." *Retherford*, 844 P.2d at 964.  "Under the test, preclusion depends

on whether the type of injury the statute addresses is a necessary element of the tort claim.  If a common law tort claim cannot be proved without also proving the type of injury addressed by the statute, then the claim is barred by the statute's exclusivity provision." *Giddings v. Utah Transit Auth.*, 107 F. Supp. 3d 1205, 1209–10 (D. Utah 2015) (citing *Retherford*, 844 P.2d at 963, 965).  "[P]reclusion 'depends on the nature of the injury for which [the] plaintiff makes [the] claim, not the nature of the defendant's act which the plaintiff alleges to have been responsible for that injury." *Id.* (quoting *Retherford*, 844 P.2d at 965).  In sum, the test requires a court to identify the injury that the UADA was designed to address and then examine the elements of Plaintiffs' claims to determine whether such injury is "a necessary element of each cause of action." *Id.* at 1210 (quoting *Retherford*, 844 P.2d at 965).

As discussed, to prevail on their IIED claim, Plaintiffs must prove that Xlear's conduct was outrageous and intolerable, that Xlear intended to cause them emotional distress, that they suffered severe emotional distress, and that that Xlear's conduct proximately caused that emotional distress.  *See  Wilson*, 2019 UT App 126 at ¶ 18, 447 P.3d at 1246.  Thus, the injury for which Plaintiffs make their claim is the "emotional distress" they endured as a result of Xlear's failure to control, warn them of, or protect them from, Mr. Robbs.  This emotional distress includes Plaintiffs' feelings that they were "trapped, intimidated, [and] scared for [their] safety and well-being" as well as their fear that they would lose their jobs.  (ECF No. 2 at ¶ 50).  Such claims injuries extend beyond a claim for "discrimination, retaliation, or harassment" and are therefore not preempted by the UADA.  *See Gottling*, 2002 UT 95 at ¶ 9, 61 P.3d at 992–93, 97 (citations omitted).

      b.  <u>The UWCA does not preempt Plaintiffs' claim that Xlear failed to control, warn them of, or protect them from, Mr. Robbs.</u>

The Utah Workers Compensation Act ("UWCA") is "designed to address 'physical and mental injuries on the job'" and is "the exclusive remedy against the employer for injuries sustained by an employee and the 'liabilities of the employer imposed by this chapter is in place of any and all other civil liability whatsoever, at common law or otherwise[.]" *Giddings*, 107 F. Supp. 3d at 1210 (quotations omitted). As discussed above, Plaintiffs' claim seeks to remedy the "severe emotional distress" they suffered as a result of Xlear's failure to control, warn them of, or protect them from, Mr. Robbs.

Citing *Mounteer v. Utah Power & Light Co.*, 823 P.2d 1055, 1058 (Utah 1991), Xlear argues that such claims for emotional distress are barred by the UWCA. However, it is well established that notwithstanding the UWCA, a worker "'may sue an employer for injuries caused by an intentional tort.'" *Gilbert v. Cereal Food Processors, Inc.*, No. 2:16-cv-894, 2017 WL 108042, at *2 (D. Utah Jan. 11, 2017) (*quoting Helf v. Chevron U.S.A., Inc.*, 361 P.3d 63, 69 (Utah 2015)); *see also Bryan v. Utah Int'l*, 533 P.2d 892, 893 (Utah 1975) (recognizing that an "intentional injury exception" exists to the workers' compensation exclusive remedy rule). In order for this exception to apply, Plaintiffs must demonstrate that Xlear "had an 'intent to injure,' which 'requires a specific mental state in which the actor knew or expected that injury would be the consequence of his action.'" *Id.* (*quoting Helf v. Chevron U.S.A., Inc.*, 203 P.3d 962, 970 (Utah 2009). "This 'intent to injure' standard presents a significant hurdle for [P]laintiffs," as it requires them to show that Xlear knew or expected that allowing Mr. Robbs to supervise them would cause them injury, as "known danger must cease to become only a foreseeable risk which an ordinary, reasonable, prudent person would avoid (ordinary negligence) and become a substantial certainty.'" *Id.* (*quoting Helf*, 203 P.3d at 974).

Plaintiffs' Complaint alleges that when they were hired, Xlear knew that Mr. Robbs had previously sexual harassed and acted inappropriately towards female employees but "failed to warn or protect [them] of and from [Mr.] Robbs's sexual harassment and behaviors."  (ECF No. 2 at ¶¶ 25–27).  Of particular importance here, Plaintiffs allege that by allowing Mr. Robbs to continue to supervise female employees, Xlear "knew or expected that injury would be caused . . . towards women, including Plaintiffs."  (*See id.*).  Although such allegations are minimal, at this stage in the proceeding, they are sufficient to establish that Xlear intended to injure them when it, knowing that Mr. Robbs had a history of inappropriate behavior, failed to control, warn them of, or protect them from, Mr. Robbs.  As such, that claim is not barred by the UWCA and thus survives Xlear's Partial Motion to Dismiss.

> ### 2. *Plaintiffs allegations that Xlear discriminated and retaliated against them cannot support their claim for IIED because they are preempted by the UADA.*

Plaintiffs' second and third allegations underlying their IIED claim are that Xlear discriminated and retaliated against them.  Xlear argues both that Plaintiffs have failed to sufficiently plead that it is liable for the discrimination and retaliation that Plaintiffs allegedly endured and that the allegations are barred by the UADA.  As discussed above, the UADA is "the exclusive remedy under state law for employment discrimination based upon . . . sex [and] retaliation"  and therefore precludes "all common law causes of action for discrimination, retaliation, or harassment by an employer on the basis of sex, race, color, pregnancy, age, religion, national origin, or disability."  Utah Code § 34A-5-107(15); *Gottling*, 2002 UT 95 at ¶ 9, 61 P.3d 989 at 992–93, 97.  Plaintiffs' allegations of discrimination and retaliation are expressly preempted by the face of the UADA and therefore must be dismissed.  Because the court finds that the UADA expressly preempts these allegations, it need not analyze Xlear's alleged direct or vicarious liability for the alleged actions.

3. *Plaintiffs allegation that Xlear breached its contract with them cannot support their claim for IIED because such conduct is not "outrageous."*

Plaintiffs' final allegation supporting their IIED claim is that Xlear breached its contractual promises and commitments to them.  As discussed above, to be considered "outrageous," alleged conduct "must evoke outrage or revulsion; it must be more than unreasonable, unkind, or unfair," and "it is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recover." *Cabaness*, 2010 UT 23 at ¶¶ 36–38, 232 P.3d at 499–500 (internal citations and quotations omitted).  "Conduct is not necessarily outrageous merely because it is tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it is illegal." *Bennett v. Jones, Waldo, Holbrook & McDonough*, 2003 UT 9, ¶ 64, 70 P.3d 17, 32 (internal quotation and citations omitted).

Here, Plaintiffs' claim that Xlear breached its contract shows that Xlear committed illegal, injurious, and potentially even malicious, conduct.  In the context of a breach of contract claim, however, the conduct was not, as a matter of law, outrageous.  While alleged breach of employment agreements are serious, they are not "more than unreasonable, unkind, or unfair" and do not "evoke outrage or revulsion." *See Cabaness*, 2010 UT 23 at ¶ 38, 232 P.3d at 500.  Utah courts "'support the rigorous scrutiny applied to attempts to expand the reach of intentional infliction of emotional distress,'" and Plaintiffs have failed to allege sufficient facts to warrant expanding the definition of "outrageous" to include Xlear's contractual breaches  here. *See Cabaness*, 2010 UT 23 at ¶ 37, 232 P.3d at 499 (citation omitted).   Indeed, finding  otherwise would  potentially permit "every breach of contract . . . violation [to] automatically give rise to an intentional infliction of emotional distress claim and tort damages, including punitive damages." *S.S. by & through Shaffer v. IHC Health Servs., Inc.*, 2018 UT 13, ¶ 10, 417 P.3d 603, 606.  The court declines to make such a broad finding here, and as such, Plaintiffs' final allegation for IIED fails and must be dismissed.

*See Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 38, 56 P.3d 524, 536 ("If the trial court determines that a defendant's conduct was not outrageous as a matter of law, then the plaintiff's claim fails . . . ." (citing *Franco*, 2001 UT 25 at ¶¶ 28–29, 21 P.3d at 207)).  Because the court finds that Plaintiffs' allegation fails, as a matter of law, to state claim for IIED, it need not analyze Xlear's potential direct or vicarious liability for the alleged actions.

## II.     Plaintiffs' Motion to Dismiss Mr. Robbs's Counterclaims is Denied.

In his counterclaim, Mr. Robbs brings causes of action against Plaintiffs for defamation and tortious interference with a contract (the "Counterclaims").  As discussed, the basis for these Counterclaims is the June 25 Email and Mailing sent by Plaintiffs' counsel, Mr. Andrus, which he allege caused his employer to learn of this lawsuit and thus caused him to lose his employment with Weider.  Plaintiffs argue that the Counterclaims should be dismissed under the doctrine of judicial privilege.

Under Utah law, "[t]he common law judicial proceeding privilege immunizes certain statements that are made during a judicial proceeding from defamation[3] claims."  *Pratt v. Nelson*, 2007 UT 41, ¶ 27, 164 P.3d 366, 376.  This privilege is "'intended to promote the integrity of the adjudicatory proceeding and its truth finding processes.'"  *Id.* (citation omitted). In order to establish the privilege, the statement in question "must be (1) made during or in the course of a judicial proceeding; (2) have some reference to the subject matter of the proceeding; and (3) be made by someone acting in the capacity of judge, juror, witness, litigant, or counsel." *Id.* at ¶ 27 (quotations and citations omitted).  While both the June 25 Email and the Mailing

---

[3] It is unclear whether judicial privilege could also apply to protect against a claim for tortious interference.  Because, as discussed herein, Plaintiffs have lost the privilege as a result of their excessive publication, this matter need not be determined by the court here.

initially appear to satisfy these requirements, "[a] party may lose the absolute immunity afforded by the judicial proceeding privilege through 'excessive publication.'"  *Id.* at ¶ 33.

A publication is excessive "if the statement 'was published to more persons than necessary to resolve the dispute or further the objectives of the proposed litigation, in other words, if the statement was published to those who did not have a legitimate role in resolving the dispute, or if it was published to persons who did not have an adequate legal interest in the outcome of the proposed litigation.'"  *Id.* (citations omitted).  "[T]he purpose of the excessive publication rule 'is to prevent abuse of the privilege by publication of defamatory statements to persons who have no connection to the judicial proceeding.'"  *Id.* (citations omitted).  In order to determine if a statement was excessively published, a court must look "to the 'overall circumstances' of the publication and determine if the purpose of the judicial proceeding privilege, which is to 'promote candid and honest communication between the parties and their counsel in order to resolve disputes,' is furthered by the statement's publication."  *Id.* at ¶ 34 (citations omitted).  In conducting this analysis, the court views the Mailing and the June 25 Email separately, and as it must on a motion to dismiss, it "accept[s] as true 'all well-pleaded factual allegations in [the Counterclaim] and view[s] these allegations in the light most favorable to [Mr. Robbs].'"  *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013) (quoting *Kerber v. Qwest Grp. Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011)).

The Mailing was addressed to Mr. Robbs and sent to an address at which Mr. Andrus believed Mr. Robbs worked.  Although the Mailing was ultimately opened by others, seemingly his coworkers, this may not have been reasonably foreseeable to, nor anticipated by, Mr. Andrus.  Indeed, when one specifically addresses a mailing to an individual, he can reasonably assume that only that individual will open the envelope, even if the letter first passes through the hands

of others.  As such, the "overall circumstances" surrounding the Mailing may not have been abusive and may legitimately have been intended to further the purpose of the judicial proceeding.  The issue, however, cannot be resolved at the pleading stage but only after further facts have been developed.

The June 25 Email was sent to Mr. Robbs's personal email address but was also sent to two of Weider's general corporate email addresses, info@joe-weider.com and online@weider.com.  The email took no precautions to limit its receipt to only Mr. Robbs, as it did not contain any notices stating that it was for Mr. Robbs's eyes only or that it should only be received and opened by him.  Although the email was addressed to Mr. Robbs, email culture neither demands nor receives the same expectations of privacy or regard that traditional mailings receive.  Thus, while it is reasonable to assume that addressing a letter to an individual will ensure that only that individual will open it, the fact that an email was addressed to an individual, but sent to others, does not allow the same assumptions to be reasonably made.  Moreover, it appears that Mr. Andrus had no reason to believe that Mr. Robbs had exclusive access to the messages sent to these addresses.  As such, and in viewing all allegations in the light most favorable to Mr. Robbs, it was entirely foreseeable, if not likely, that the June 25 Email would be opened, and its contents reviewed, by someone other than Mr. Robbs.  The allegations support a reasonable inference that others at Weider would have had access to, and could have reasonably been expected to open, the email and its attachments.

Mr. Andrus defends the June 25 Email by arguing that it was his "duty and legal right" to send it under Rule 4 of the Federal Rules of Civil Procedure.  In effect, he argues that because Mr. Robbs did not respond to his June 19 email asking him to waive service, he had the right to send the June 25 Email.  This argument fails for two reasons.  First, because he believed that Mr.

Robbs was located in Germany, Mr. Andrus was required to give him, under Rule 4(d)(1)(F) of the Federal Rules of Civil Procedure, "at least 60 days" to respond to the request for waiver of service contained in the June 19 Email, but that email impermissibly gave Mr. Robbs just five days to respond. Thus, when Mr. Andrus sent the June 25 Email, Mr. Robbs had not violated Rule 4 by failing to avoid unnecessary expenses of service of process, and the email was therefore unjustified and untimely. Second, under Rule 4(d)(1)(G), a waiver for service must be sent "by first-class mail or other reliable means." Here, Mr. Andrus justifies his inclusion of the Weider corporate addresses on the June 25 Email because they assumed that Mr. Robbs's failure to respond to the June 19 Email was because his personal address "may not be a good or valid email, or a reliable means of contact." (*See* ECF No. 36 at 3). This supports that the June 19 email may not therefore have been sent by "other reliable means." Because neither the June 19 Email nor the June 25 Email complied with Rule 4, Plaintiffs cannot use that rule to shield them from Mr. Robbs's allegation that the Complaint has been excessively published. Next, Plaintiffs attempt to distinguish their publications from those that have been recognized as excessive in case law, noting that *Pratt* involved plaintiffs who provided a copy of the complaint to reporters and media outlets and that *Lifevantage Corp. v. Domingo*, 208 F. Supp. 3d 1202, 1221 (D. Utah 2016) involved the posting a complaint to a website and the use of the same as talking points. Although the Complaint here was indeed published to less people than were the complaints at issue in *Pratt* or *Lifevantage*, publication does not become excessive only when it is made to a certain minimum number of people. Rather, because the Complaint here was published "to more persons than necessary to resolve the dispute or further the objectives of the proposed litigation" and "to those who did not have a legitimate role in resolving the dispute," at this stage in the proceedings, the court cannot find that its publication was not excessive. *See Pratt*, 2007 UT 41

at ¶ 33.  As such, the court cannot, at this point, find that Plaintiffs are protected by the judicial proceedings privilege, and their Motion to Dismiss Robbs's Counterclaims must therefore be denied.

## CONCLUSION

For the reasons stated herein, defendant Xlear's Partial Motion to Dismiss Plaintiffs' State Law Claims (ECF No. 11) is **GRANTED IN PART AND DENIED IN PART**. Specifically, Plaintiffs' Second Cause of Action, alleging Civil Assault, and Third Cause of Action, alleging Civil Battery, are **DISMISSED** against Xlear.  Further, Plaintiffs' Sixth Cause of Action, alleging Intentional Infliction of Emotional Distress, is **DISMISSED IN PART** against Xlear.  Plaintiffs **MAY PURSUE** their IIED claim as it relates to their allegations that Xlear failed to control, warn them of, or protect them from, Mr. Robbs; however, because as a matter of law Plaintiffs cannot prevail on their allegations that Xlear is liable for IIED as a result of its alleged discrimination, retaliation, and breach of contract, such allegations are **DISMISSED**.

Moreover, for the reasons stated herein, Plaintiffs' Motion to Dismiss William Robbs's Counterclaims (ECF No. 28) is **DENIED**.

Dated the 11th day of May, 2020.

BY THE COURT:

Clark Waddoups
United States District Court Judge